## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ST. CHARLES SURGICAL**                        CIVIL ACTION
**HOSPITAL LLC, ET AL.,**
    *Plaintiffs*

**VERSUS**                                       NO. 20-2904

**HUB INTERNATIONAL, LTD., ET AL.,**             SECTION: "E" (3)
    *Defendants*

### ORDER AND REASONS

Before the Court is the motion to remand by Plaintiffs Center for Restorative Breast Surgery, LLC ("CRBS") and St. Charles Surgical Hospital, LLC ("SCSH") (together, the "Hospital").[1]

### BACKGROUND

This insurance dispute arises out of the COVID-19 pandemic in Orleans Parish, Louisiana.[2] On May 1, 2020, the Hospital filed a claim in the Civil District Court for the Parish of Orleans, Louisiana against Defendant Jordan Parnell for negligence based on his alleged failure to advise the Hospital about the availability of pandemic coverage.[3] The Hospital also has filed claims for breach of contract, negligence, insurance proceeds, and bad faith penalties against Defendants Starr Surplus Lines Insurance Company ("Starr") and HUB International, Ltd. ("HUB").[4]

On October 23, 2020, Starr removed this action to the United States Court for the Eastern District of Louisiana, invoking this Court's diversity jurisdiction under 28 U.S.C.

---

[1] R. Doc. 13. Defendant Star Surplus Lines Company ("Starr") opposes the motion. R. Doc. 21. Defendants HUB International, Ltd. ("HUB") and Jordan Parnell oppose the motion. R. Doc. 22. Plaintiffs filed a reply. R. Doc. 31. Defendant Starr filed a sur-reply. R. Doc. 36. Defendants HUB and Parnell filed a sur-reply. R. Doc. 39.

[2] R. Doc. 1-1 at 14, ¶ 11.

[3] R. Doc. 1-1 at 26, ¶ 61.

[4] R. Doc. 1-1 at 25-28, ¶¶ 60-70.

§ 1332.[5] CRBS and SCSH are limited liability companies with Louisiana citizens as members and are deemed Louisiana citizens for jurisdictional purposes. Jordan is a Louisiana citizen. Defendants Starr and HUB are not citizens of Louisiana.

On November 23, 2020, Plaintiffs moved to remand the action.[6]

### STANDARD

Federal courts are courts of limited jurisdiction and possess only the authority conferred upon them by the U.S. Constitution or by Congress.[7] A civil action over which federal courts have original jurisdiction may be removed to federal court unless expressly prohibited by another statute.[8] The principles of comity and federalism mandate strict construction of removal statutes in order to minimize encroachment on the sovereignty of state courts.[9]

A common ground for removal is diversity jurisdiction, which is designed to provide out-of-state defendants a forum to litigate free of local prejudices.[10] When removal is based on federal diversity jurisdiction, 28 U.S.C. § 1332 requires the removing party to show that (1) complete diversity of citizenship exists between the parties, and (2) the amount in controversy exceeds $75,000.00, exclusive of interest and costs.[11] Jurisdiction is decided at the time of removal.[12] "The removing party bears the burden of showing that federal jurisdiction exists and that removal was proper."[13] "In every case

---

[5] R. Doc. 1.

[6] R. Doc. 13.

[7] *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).

[8] 28 U.S.C. § 1441(a).

[9] *See Gutierrez v. Flores*, 543 F.3d 248, 251 (5th Cir. 2008).

[10] *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 716 n6 (5th Cir. 1975) ("The very purpose of federal diversity jurisdiction is to avoid bias against parties from outside the forum state.").

[11] *Garcia v. Koch Oil Co. of Tex., Inc.*, 351 F.3d 636, 638 (5th Cir. 2003) (citing *St. Paul Reinsurance Co. v. Greenburg*, 134 F.3d 1250, 1253 (5th Cir. 1998)).

[12] *Id. See Gebbia v. Wal-Mart Stores, Inc.*, 233 F.3d 880 (5th Cir. 2000) (recognizing that subsequent events, such as a reduction in the amount in controversy, will generally not divest jurisdiction).

[13] *See Manguno v. Prudential Property and Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002).

where a diverse defendant proves that the plaintiff's decision to join an in-state party is improper, the diverse defendant gains access to the federal courts. If, however, the foreign defendant fails to prove the joinder improper, then diversity is not complete, the diverse defendant is not entitled to remove, and remand is mandated."[14]

## LAW AND ANALYSIS

In its notice of removal, Starr argues Parnell's non-diverse citizenship should be disregarded under the improper joinder doctrine.[15] 28 U.S.C. § 1441(b)(2) prohibits removal solely on the basis of diversity jurisdiction "if any of the parties in interest *properly joined* and served as *defendants* is a citizen of the State in which such action is brought."[16] Under the improper joinder doctrine, a court may dismiss an *improperly joined defendant* from a removed state case and disregard that defendant's citizenship for purposes of diversity jurisdiction.[17]

The Fifth Circuit has recognized two ways for the removing party to establish improper joinder: (1) "actual fraud in the pleading of jurisdictional facts" or (2) an "inability of the plaintiff to establish a cause of action against the non-diverse party in state court."[18] Only the latter is of concern in this case because Starr does not argue Plaintiffs' jurisdictional allegations were fraudulent. Instead, Starr argues the Hospital has no reasonable possibility of recovery against Parnell because (1) the duty he allegedly breached is not recognized under Louisiana law, and (2) his claims are perempted.

---

[14] *Smallwood v. Ill. Cent. R. Co.*, 385 F.3d 568 (5th Cir. 2004).
[15] R. Doc. 1 at ¶ 14. Plaintiffs are Louisiana limited liability companies whose individual members are Louisiana resident. *Id.* at ¶¶ 3, 5. Defendant Jordan Parnell is a Louisiana resident. *Id.* at ¶ 14.
[16] 28 U.S.C. § 1441(b)(2) (emphasis added).
[17] *Flagg v. Stryker Corp.*, 819 F.3d 132, 136 (5th Cir. 2016) (en banc).
[18] *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (citing *Travis v. Irby*, 326 F.3d 644, 646–47 (5th Cir. 2003)).

Defendants' burden of persuasion on Plaintiffs' improper joinder is heavy.[19] "In determining the validity of an allegation of improper joinder, the district court must construe factual allegations, resolve contested factual issues, and resolve ambiguities in the controlling state law in the plaintiff's favor."[20] "The test for improper joinder where there is no allegation of actual fraud is whether the defendant has demonstrated that there is no possibility of recovery by the plaintiff against an in-state defendant."[21] While the standard for evaluating a claim of improper joinder is similar to the standard used when evaluating a Rule 12(b)(6) motion for failure to state a claim, the scope of the Court's inquiry is broader than it would be with a Rule 12(b)(6) motion; the Court will not "pre-try" the case, but the Court may, in its discretion, "pierce the pleadings" under certain circumstances and consider summary judgment type evidence to determine whether the plaintiff's claim has a factual basis.[22] Although post-removal filings may not be considered to support *new* causes of action not raised in the state court petition, they may be scrutinized "for purposes of determining whether there is any reasonable basis for predicting that [the plaintiff] might be able to establish [the defendant's] liability on the pleaded claims."[23] In *B, Inc. v. Miller Brewing Co.*, the Fifth Circuit clarified what each party may introduce:

> In support of their removal petition, the defendants may submit affidavits and deposition transcripts; and in support of their motion for remand, the plaintiff may submit affidavits and deposition transcripts along with the factual allegations contained in the verified complaint.[24]

---

[19] *Travis*, 326 F.3d at 649.

[20] *Rodrigue v. Continental Ins. Co.*, No. 14-1797, 2014 WL 4999465, at *2 (citing *Burden v. Gen. Dynamics Corp.*, 60 F.3d 213, 216 (5th Cir. 1995)).

[21] *Rodrigue v. Continental Ins. Co.*, No. 14-1797, 2014 WL 4999465, at *2 (E.D. La. Oct. 7, 2014) (citing *Smallwood*, 385 F.3d at 573).

[22] *Ross v. Citifinancial, Inc.*, 344 F.3d 458, 461 (5th Cir. 2003).

[23] *Griggs v. State Farm Lloyds*, 181 F.3d 694, 700 (5th Cir. 1999).

[24] *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. 1981); *See Carriere v. Sears Roebuck and Co.*, 893 F.2d 98 (5th Cir. 1990) ("While we have frequently cautioned the district courts against pretrying a case to determine removal jurisdiction, we have also endorsed a summary judgment-like procedure for disposing of fraudulent joinder claims.").

"[T]he inability to make the requisite decision in a summary manner itself points to an inability of the removing party to carry its burden."[25] "[A]lthough the type of inquiry into the evidence is similar to the summary judgment inquiry, the district court is not to apply a summary judgment standard but rather a standard closer to the Rule 12(b)(6) standard."[26] "The district court must also take into account 'the status of discovery' and consider what opportunity the plaintiff has had to develop its claims against the non-diverse defendant."[27]

## I.    Plaintiffs have a possibility of recovery against Jordan Parnell.

Plaintiffs bring a claim of negligence against Jordan Parnell for his failure to advise them of the availability of pandemic coverage.[28] Defendants argue Plaintiffs have no possibility of recovery against Parnell because the duty he allegedly breached is not recognized under Louisiana law.

Ordinarily, an insurance agent's failure to procure desired coverage for a client is actionable only under limited conditions in Louisiana.[29] "[T]he plaintiff must establish: '(1) an undertaking or agreement by the insurance agent to procure insurance; (2) failure of the agent to use reasonable diligence to obtain insurance and to notify the client promptly of the absence of coverage; and (3) actions by the agent which warranted the client's assumption that he was insured in the amount of the desired coverage."[30] "On the other hand, the client is himself considered responsible for adequately advising the agent of the coverage needed and for reading the clear provisions of the insurance policy."[31]

---

[25] *Id.* at 574.
[26] *McKee v. Kansas City S. Ry. Co.*, 358 F.3d 329, 334 (5th Cir. 2004).
[27] *Id.*
[28] R. Doc. 1-1 at 24, ¶ 54.
[29] *Karam v. St. Paul Fire & Marine Ins. Co.*, 281 So.2d 728, 730-31 (La. 1973).
[30] *Prest v. La. Citizens Prop. Ins. Corp.*, 125 So.3d 1079, 1086 (La. 2012) (quoting *Taylor v. Sider*, 765 So.2d 416, 418 (La.App. 4 Cir. May 31, 2000), *writ denied* (La. Oct. 6, 2000)).
[31] *Motors Ins. Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199, 205 (5th Cir. 1990) (citing *Smith v. Millers Mut. Ins. Co.*, 419 So.2d 59, 65 (La.App. 2 Cir. Aug. 17, 1982), *writ denied*, 422 So.2d 155 (La. 1982)).

While there is a duty of due diligence in procuring *requested* coverage and notifying a client of the failure to do so,[32] there is no general duty imposed on insurance agents to advise clients of insurance options in Louisiana.[33]

Louisiana courts have recognized an insurance agent may have a broader duty under certain circumstances. "An insurance agent's duty can be greater than merely procuring the insurance requested, depending on what services the agent holds himself out as performing and the nature of the specific relationship and agreements between the agent and his client."[34] If the insurance agent becomes more than a "mere order taker' for the insured," then the agent may have fiduciary duties to "advis[e] the client with regard to recommended coverage, investigat[e] and ascertain[] the financial condition of prospective companies, and notify[] the insured of policy cancellations or terminations."[35] "Where an agent is familiar with the insured's business, has reason to know the risks against which an insured wants protection, and has experience with the types of coverage available in a particular market, we must construe an undertaking to procure insurance as an agreement by the agent to provide coverage."[36]

In its First Supplemental and Amending Petition filed in the Civil District Court for the Parish of Orleans, the Hospital alleges HUB and its agent, Parnell, "have held themselves out as the leading advisors of healthcare insurance to [the] Hospital, but have woefully failed to so advise;"[37] "never discussed the option of pandemic coverage with the

---

[32] *See Karam v. St. Paul Fire & Marine Ins. Co.*, 281 So.2d 728, 730-31 (La. 1973) ("The client may recover from the agent the loss he sustains as a result of the agent's failure to procure the desired coverage. . .").
[33] *Isidore Newman School v. J. Everett Eaves, Inc.*, 42 So.3d 352 (La. 2010).
[34] *Belmont Commons, LLC v. Axis Surplus Ins. Co.*, 569 F.Supp.2d 637, 644 (E.D. La. July 28, 2008).
[35] *Offshore Prod. Contractors, Inv. V. Rep. Underwriters Ins. Co.*, 910 F.2d 224, 230 (5th Cir. 1990).
[36] *Id.*
[37] R. Doc. 1-1 at 23, ¶ 50.

Hospital;"[38] and are "liable. . . by failing to advise it, as a healthcare facility, of the availability of such coverage."[39]

The petition alleges that HUB and Parnell held themselves out to be more than agents who merely procured requested insurance. Plaintiffs point to HUB's website, which includes the following statements:

- "We understand your need to protect all areas of liability and exposures. . ."
- "Our team will work with you to develop integrated business insurance, risk management and employee benefits solutions that help improve the performance of your organization and: . . . protect your people, property and profits. . ."
- "Our healthcare systems and hospital insurance specialists will help you manage your total cost of risk with solutions to address: Patient and worker safety, including slips, trips and falls, needle sticks, and infection control."
- "Let us be your partner in risk management."
- Our healthcare system and hospital insurance specialists will help you: Identify potential gaps and deficiencies in your existing programs."[40]

Plaintiffs cite Parnell's profile on the social media site LinkedIn, which states, "Jordan Parnell is the Healthcare Practice Group leader for HUB INTERNATIONAL's Gulf South Region. Our practice group consults, designs risk management programs, and brokers insurance transactions on our client['s] behalf. Jordan is also on the national healthcare team of HUB International which helps direct national objectives for the healthcare vertical."[41] Plaintiffs further attach blogposts authored by Parnell titled, "Urgent Risks Grow as Centers Grow in Numbers & Utilization," "Best Practices for Medical Records Management," "Senior Care Insurance Renewals in a Hard Market," "Four Ways for Long-Term Care Providers to Improve their Risk Position," and "Five Ways Your Long-Term Care Facility can Guard Against Legal Actions."[42]

---

[38] R. Doc. 1-1 at 24, ¶ 54.
[39] R. Doc. 1-1 at 25, ¶ 25.
[40] R. Doc. 31-2 at 3-4 (citing https://www.hubinternational.com/industries/healthcare-insurance/hospital-insurance/).
[41] R. Doc. 31-2 at 5 (citing https://www.linkedin.com/in/jordan-parnell-6a670838)
[42] R. Doc. 31-2 at 23-35.

With respect to the nature of the specific relationship and agreements between the agent and his client, the Hospital argues it relied on Parnell to understand its business and to advise it of the coverage it needed and has presented summary judgment-style in support of this argument. Plaintiffs attach the affidavit of Dr. Scott K. Sullivan, Jr., the Hospital's owner, who attested, "Parnell and the Hospital representatives would discuss the Hospital's insurance needs and Mr. Parnell would advise and secure coverage for the hospital, including presenting and recommending to the Hospital various options for the same."[43] Dr. Sullivan further attested that the "Hospital hired and maintained its relationship with the individual Mr. Parnell specifically" and that the Hospital's representatives "met with Mr. Parnell at least annually regarding coverage."[44] Plaintiffs further attach the affidavit of Louis G. Fey, an insurance expert, who attests, "Parnell offers not only insurance advice but wide ranging Risk Management advice to the Healthcare industry, in his role as the head of both HUB's Gulf Coast and National Health Care Teams. Parnell is far more than your run of the mill street insurance agent order taker."[45]

Without passing judgment on the merits of Plaintiffs' claims, the Court finds there is a possibility of recovery against Parnell.

## II.     The claim against Parnell is not perempted.

Because there is a possibility of recovery based on the scope of the duty assumed by Parnell, the Court must determine whether there is, nevertheless, no possibility of recovery against Parnell because the claim against him is perempted.

---

[43] R. Doc. 31-1 at ¶ 6.
[44] R. Doc. 31-1 at ¶¶ 5-6.
[45] R. Doc. 31-2 at ¶ 15.

Starr argues the Hospital's claim against Parnell is statutorily perempted on the face of the state court petition.[46] La. Rev. Stat. § 9:5606, titled "Actions for Professional Insurance Agent Liability" states:

> A. No action for damages against any insurance agent, broker, solicitor, or other similar licensee under this state, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide insurance services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered. However, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect.
> . . .
> D. The one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended.

"Peremption is a period of time fixed by law for the existence of a right. Unless timely exercised, the right is extinguished upon the expiration of the peremptive period."[47] Peremption need not be pleaded.[48] "Peremption may not be renounced, interrupted, or suspended."[49] "Peremptive statutes are strictly construed against peremption and in favor of the claim. Of the possible constructions, the one that maintains enforcement of the claim or action, rather than the one that bars enforcement should be adopted."[50]

"Ordinarily, the exceptor bears the burden of proof at the trial of the peremptory exception."[51] Accordingly, Defendants bear the burden of proof on the issue of

---

[46] R. Doc. 21 at 14. HUB and Parnell adopt Starr's arguments. R. Doc. 22 at 1.
[47] LA. CIV. C. art. 3458.
[48] LA. CIV. C. art. 3460.
[49] LA. CIV. C. art. 3461.
[50] *Rando v. Anco Insulations Inc.*, 2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1083 (citation omitted).
[51] *Id.* at 1082.

peremption. They must show there is no genuine issue of fact that the peremptive period began more than three years before the Hospital filed suit in state court on May 1, 2020.[52]

The original insurance policy issued to the Hospital commenced on February 9, 2016.[53] Additional insurance policies were issued to the Hospital following consultation with HUB and Parnell in 2017, 2018, and in 2019.[54] In his affidavit, Dr. Sullivan attested that the Hospital's representatives "met with Mr. Parnell at least annually regarding coverage for the Hospital. Mr. Parnell and the Hospital representatives would discuss the Hospital's insurance needs and Mr. Parnell would advise and secure coverage for the Hospital. . ."[55] Starr argues any claims were extinguished on February 9, 2019—three years after the date the first policy issued to the Hospital took effect.[56] The Hospital argues the prescriptive period began on May 31, 2019.[57]

Defendants argue any claim against Parnell was perempted three years after the date the first policy issued to the Hospital went into effect. Defendants cite *Bel v. State Farm Mut. Auto Ins. Co.* in support of their argument that renewals are "nothing more than a continuation of the ill effects of an original unlawful act."[58] In *Bel*, the Louisiana First Circuit Court of Appeal held that the plaintiff's claim of bad advice against an insurance agent was perempted by La. Rev. Stat. § 9:5606. The court noted, however, that "[i]n order for each renewal to be the basis of a separate tort, the complained of conduct

---

[52] R. Doc. 1-1 at 1.

[53] R. Doc. 10-2 at 5 ("Policy Period: From 09/09/2016 at 12:01 A.M., to 02/09/2017 at 12:01 A.M. Local Time at the address of the insured listed in the declarations.").

[54] *See* R. Doc. 31-1 at ¶ 6.

[55] R. Doc. 31-1 at ¶ 6.

[56] R. Doc. 21 at 16.

[57] R. Doc. 1-1 at 13, ¶ 9 and 24, ¶ 53. The Hospital alleges that, in August 2019, it discovered an issue with the stated square footage of its property causing it to be underinsured. *Id.* at 23, ¶ 51. The Hospital further alleges in its complaint that Parnell found the mistake to be "concerning." *Id.* at 24, ¶ 52. These facts are immaterial.

[58] *Bel v. State Farm Mut. Auto. Ins. Co.*, 845 So.2d 377, 382 (La.App. 1 Cir. Feb. 14, 2003), *writ denied*, 845 So.2d 1057 (La. 2003).

must consist of separate and distinct acts, each of which gives rise to immediately apparent damages."[59] In a footnote, Defendants point to *Campbell v. Stone Ins., Inc.*[60] to argue "subsequent renewals of allegedly-deficient policies do not interrupt or restart the peremptive period."[61] In *Campbell*, an insurer incorrectly assured the plaintiffs that their policy would cover them from flooding.[62]  The plaintiffs later discovered the policy did not actually provide such coverage once their home was actually flooded. By then, the peremptive period had passed. The *Campbell* plaintiffs brought suit in state court, the matter was removed to this Court, and this Court refused to remand the matter because it found the claims against the non-diverse insurance agent were perempted.[63] The instant matter is distinguishable from *Campbell*, however, because the plaintiffs in *Campbell* merely sought to bring a claim against the agent for misrepresenting the policy he had procured. In *Campbell*, the plaintiffs did not allege that the insurance agent carried a greater duty to advise and consult with the insured. In this case, the Hospital relied on Parnell each year to analyze its insurance needs and to advise on the options of coverage available, including pandemic coverage.[64]

In *Fidelity Homestead Assoc. v. Hanover Ins. Co.*, a savings and loan association brought suit against its diverse insurer to enforce coverage under its policy and against non-diverse independent agents for negligently failing to advise on insurance policies.[65] The insurer removed to federal court arguing that the non-diverse independent agents

---

[59] *Id.* (citing *Bustamento v. Tucker*, 607 So.2d 532, 540 (La. 1992)).
[60] *Campbell v. Stone Ins., Inc.*, 509 F.3d 665 (5th Cir. 2007).
[61] R. Doc. 21 at 16 n.22.
[62] *Campbell*, 509 F.3d at 670.
[63] *Id.*
[64] *See* R. Doc. 31-1 at ¶¶ 6, 8 ("Parnell would advise and secure coverage for the Hospital, including presenting and recommending to the Hospital various options for the same. . . Parnell never discussed the option of additional pandemic coverage with the Hospital.").
[65] *Fidelity Homestead Assoc. v. Hanover Ins. Co.*, 458 F.Supp.2d 276, 278 (E.D. La. Oct. 5, 2006).

were fraudulently joined to prevent removal.[66] The savings and loan association moved to remand on the ground that it did have a viable cause of action against the non-diverse independent agents.[67] Another section of this Court considered the question of when peremption commences when an insurer has assumed a duty beyond mere insurance procurement and explained:

> In general, renewals of insurance policies do not operate to restart peremption. However, renewals can be the basis of separate torts, if the complained of conduct constitutes separate and distinct acts, which give rise to immediately apparent damages. The inquiry is whether the actions of the insurance agents at the time of renewal can be construed to constitute an act separate from the initial policy procurement.[68]

The instant matter is similar to *Hanover*. The Hospital is bringing suit against a non-diverse insurance agent who, it alleges, breached a duty to advise on insurance policies each year. If Parnell breached his duty to consult, analyze, and advise the Hospital each year, his actions at the time of each renewal can be construed to constitute an act separate from the initial policy procurement.

In this action, Plaintiffs argue the "assumed duty require[d] more than rubber-stamping a renewal annually" and that Parnell's "failure to discuss communicable disease coverage with the Hospital was 'substandard and unreasonable' during the 2019 renewal process.[69] The Hospital argues Parnell "met with representatives of the hospital at least annually regarding [the] Hospital's insurance needs and advise and secure coverage for the Hospital."[70] The Hospital argues that each renewal process "was not a mere carrying forward of the prior policies."[71]

---

[66] *Id.*
[67] *Id.*
[68] *Id.* at 280.
[69] R. Doc. 31 at 12.
[70] R. Doc. 31 at 12.
[71] R. Doc. 31 at 12.

In *Jackson v. QBE Specialty Ins. Co.*, an insurance company had an office policy of reviewing and discussing available coverage options with clients.[72] Although it had assumed this greater duty beyond mere insurance procurement, it had failed to advise the plaintiffs of available mold coverage. The plaintiffs brought suit after they suffered mold damages. The court recognized that the peremptive period of § 9:5606 ordinarily begin to run on the date that a copy of the insurance policy was received and that some courts have even held that it begins to run once insurance applications were received by the agent.[73] It found, however, that when an insurer has voluntarily assumed the fiduciary duty of advising and exploring insurance options tailored to a client's needs, then the peremptive period could likely have commenced once the client discovered the insurer's failure to advise.[74]

In this case, the policy in effect at the time the damages had a policy period commencing on May 31, 2019[75] and the Hospital did not discover that Parnell had failed to advise it of the availability of pandemic coverage until the COVID-19 pandemic struck thereafter.[76] Plaintiffs filed suit in the Civil District Court for the Parish of Orleans on May 1, 2020.[77] The Hospital's claim against Parnell is not perempted.

## CONCLUSION

**IT IS HEREBY ORDERED** that the motion to remand by Plaintiffs Center for Restorative Breast Surgery, LLC and St. Charles Surgical Hospital, LLC is **GRANTED**.[78]

---

[72] *Jackson v. QBE Specialty Ins. Co.*, Civ. No. 17-11730, 2018 WL 3408182 (E.D. La. July 13, 2018).
[73] *Id.* at *7 (citing *Campbell v. Stone Ins. Co.*, 509 F.3d 665, 672 (5th Cir. 2007) and *Bates v. Allstate Ins. Co.*, 48 So.3d 1141, 1144 (La.App. 4 Cir. Sept. 29, 2010)).
[74] *See Jackson v. QBE Specialty Ins. Co.*, Civ. No. 17-11730, 2018 WL 3408182 at *9 (E.D. La. July 13, 2018) ("Under this theory, the peremptive period would likely not have begun to run until... when Plaintiff's discovered Terrebonne's policy.").
[75] R. Doc. 1-1 at 13, ¶ 9.
[76] R. Doc. 1-1 at 24, ¶ 55 ("Hospital has recently become aware of specific coverage available for 'contagious or infectious disease,' 'outbreaks,' 'medical catastrophes,' and 'contagion'. . . ").
[77] R. Doc. 1-1 at 1.
[78] R. Doc. 13.

This matter is **REMANDED** to the Civil District Court for the Parish of Orleans, Louisiana.

      **New Orleans, Louisiana, this 21st day of April, 2021.**

                                     **SUSIE MORGAN**
                         **UNITED STATES DISTRICT JUDGE**